IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                          No. 3:95-CV-0881-T

OLDRICH TOMANEK,

    Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was tried on the merits before the Court. After considering the evidence and arguments presented at trial, as well as the stipulations of the parties, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52. The Court reserves the right to enter more specific findings of fact and conclusions of law should the Court consider it necessary.

### Findings of Fact

These findings of fact incorporate relevant facts stipulated by the parties in the Joint Pretrial Order. Many of the facts themselves are undisputed. Rather, it is the proper meaning or interpretation to be attached to the facts that is in dispute. The Court finds each of the following facts by a preponderance of the evidence.

1.  On May 11, 1995, Plaintiff United States of America filed suit against Defendant Oldrich Tomanek pursuant to the Freedom of Access to Clinic Entrances Act of 1994 (FACE), 18 U.S.C. § 248(a)(1).

2.  Plaintiff originally sought an injunction, statutory damages, and civil penalties, but later dropped its claims for civil penalties and statutory damages and now seeks only injunctive relief.

### The Routh Street Women's Clinic

3.  During the period relevant to this suit, the Routh Street Women's Clinic was located at 4228 North Central Expressway in Dallas, Texas, bounded on the south by Normah Street and on the north by Lee Street.[1]

4.  At the time of trial, the clinic had relocated to 4321 North Central Expressway, Dallas, Texas.

5.  The clinic provides abortion services along with other reproductive health services including gynecological examinations, birth control counseling, and pap smear procedures.

6.  The clinic is a "facility" as defined by FACE.

7.  The clinic is a private commercial entity, incorporated in Texas, and operated for profit. Clinic patients pay for the services they receive.

8.  The clinic's patients come from Texas and other states.

9.  The clinic purchases its supplies from companies in Texas and from companies outside Texas.

---

[1] All references herein to the clinic relate only to this 4228 North Central Expressway location unless otherwise stated.

10.   The clinic engages in interstate commerce.

### Plaintiff's Witnesses

11.   During the relevant period, the following witnesses were associated with the clinic:

William West, M.D., is a medical doctor specializing in obstetrics and gynecology who provided reproductive health services, including abortion procedures.

Opta Lea Braun, M.D., is a medical doctor specializing in obstetrics and gynecology who provided reproductive health services, including abortion procedures. Dr. Braun had the controlling ownership interest in the clinic.

Virginia Braun, with her husband, Dr. Braun, served on the board of directors of the clinic and she, without salary, performed various administrative functions. The Brauns are the only members of the clinic's board.

Linda Cortez was employed as a licensed vocational nurse.

Bethany Herrera was employed as Supervisor of Patient Relations.

Charlotte Taft was employed as director of the clinic until January 30, 1995.

Shelley Oram was employed as a counselor and security liaison until January 30, 1995.

Barbara Bartsch-Allen was employed as a receptionist until mid-August 1995.

Kassie Gossom was employed as business manager and personnel director until October 1995.

Mary Jones was employed as Clinic Director until October 1995. Before being appointed Clinic Director in February 1995, she served as a patient relations counselor.

Corina Suarez was employed as a part-time patient relations counselor from April 1995 until October 1995.

Tanya McBee was employed as an administrative assistant from May 1995 to February 1996.

Janie Bush was a part-time salaried employee until September 1995. In that capacity, she performed some security functions. Also, during this period, she was Executive Director of the Choice Foundation, a non-profit organization that advocates reproductive rights and provides related educational services. Until May 1996, she occupied office space on the ground floor of the two-story building complex where the clinic was located. The office space was provided to the Choice Foundation by the clinic without charge.

### Defendant Oldrich Tomanek

12. Defendant Oldrich Tomanek is an abortion protester and characterizes himself as part of the pro-life movement. He is not a political activist, nor does he protest on behalf of any particular organization.

13. Tomanek was born in Czechoslovakia and came to the United States in 1987. English is his second language, and although he speaks and understands English, he is not fluent in it and is sometimes difficult to understand.

14. Tomanek considers himself to be a "missionary for life." His stated mission is to protect unborn babies and to dissuade those who seek or provide abortion services. Daily, he attends a Catholic church and reads his Bible. He bases his beliefs about abortion on his interpretation

of the Bible and the teachings of Catholicism, and protests against abortion because he feels it is God's will for him to do so.

15. Tomanek does not recognize a woman's right to seek an abortion and does not recognize any person's right to provide abortion services. The only exception being when the life of the mother is in danger. He regards the clinic's staff as engaging in Satanic works and believes that abortion is always illegal.

16. Since approximately January 1994, Tomanek regularly demonstrated at the clinic during business hours on the days that abortion procedures were ordinarily performed, which were Wednesdays through Saturdays, rain or shine.

17. Tomanek's objective at the clinic was to dissuade its staff from providing, and women from seeking, abortion services.

18. Tomanek ceased protesting at the clinic after over a year and a half of demonstrating there, sometime in the latter part of 1995.

19. Tomanek protested at the clinic's new location on only a few occasions.

### Tomanek's Activities at the Clinic Premises

#### His Actions

20. Tomanek often stood in the clinic driveways and on sidewalks next to the driveways to meet patients and the people who accompanied them as they drove into the clinic's parking lot. Tomanek would approach the vehicles with leaflets and offer them to the vehicles' passengers.

21. Tomanek's stopping of cars was limited to delaying them long enough to walk around to the doors to offer passengers literature and speak with them.

22. Patients and clinic employees, on occasion, tried to intimidate Tomanek by driving their vehicles fast over the curb and sidewalk where Tomanek stood attempting to hand out literature to passing vehicles.

23. On one occasion, a man accompanying a patient to the clinic took a picket out of Tomanek's hand, broke the pole from the sign, and hit Tomanek on the head with the broken pole, causing Tomanek to bleed. Tomanek did not fight back or react to the attack other than to step back and later call the police.

On another occasion, a man accompanying a patient to the clinic chased Tomanek with a stick, and Tomanek jumped into a ditch to escape. The man also threw stones at Tomanek, hitting him with one stone. Tomanek did not react to the attack other than to later call the police.

Members of the clinic observed these attacks upon Tomanek.

24. In 1994 and 1995, Tomanek sometimes wore military camouflage apparel when present at the clinic. Also, during the relevant period, Tomanek possessed various pistols and rifles. However, there is no evidence that Tomanek ever displayed any weapons at the clinic or to any clinic staff member or patient, or that he ever threatened or intimidated any staff member or patient with a weapon. There is no evidence that Tomanek ever stated, directly or indirectly, to any clinic staff member or patient, that he had a weapon or that he intended to use it against anyone at the clinic. He disposed of his weapons in early 1995 and at the time of trial, did not own any guns.

The only testimony about any gun being at the clinic was that Virginia Braun showed Tomanek a handgun that she had in her purse.

25. Some employees at the clinic took photograph of Tomanek and videotaped him while he demonstrated at the clinic.

No photograph, videotape, or other evidence was produced indicating that Tomanek ever physically blocked the door of the clinic.

No photograph or videotape was produced demonstrating that Tomanek physically obstructed access to the clinic or stood in front of cars to prevent their entry onto the clinic premises.

26. There is no evidence that Tomanek ever touched any staff member at the clinic or prevented any staff member from doing his or her job for the clinic.

27. Tomanek, on occasion, met clinic staff members on the public sidewalks and streets outside the clinic premises as they returned from purchasing a meal at a nearby Jack-in-the-Box restaurant. As to these instances, there is no credible evidence that Tomanek physically obstructed any person from returning to the clinic or made unreasonable or hazardous the ingress to or egress from the clinic property.

## His Words

28. The area of the clinic adjoining North Central Expressway, where Tomanek often stood, is noisy because of automobile traffic and construction. Tomanek often spoke loudly to people entering the clinic in order to be heard over the noise of North Central Expressway. He also spoke loudly to the patients in the parking lot in order to be heard from the sidewalk where he stood.

29. Clinic staff sometimes placed a sound amplifying device, a "boom box," outside and played music loudly to drown out Tomanek's words.

30. At the clinic, Tomanek made the following statements, among others, to clinic employees or to patients, or to both, on repeated occasions:

He described himself as a "soldier of God."

"Your time grows short. Why do you kill baby boys and girls? You will pay."

"Remember that bloodshed follows bloodshed."

"How would you like it if someone took your life," (or words to that effect).

"You're going to die."

"Live every day as if it's your last."

31. Tomanek advised men who entered the clinic that a real man would not bring his woman to a place like the clinic.

32. To pregnant women at the clinic, Tomanek said, among other things: "Don't kill your baby, God doesn't want you to do this. Don't be selfish young mother"; "People—people can help you, we can help you"; and "God loves you, Jesus loves you, Jesus loves your baby."

33. Members of the clinic staff asked Tomanek not to bother them or the patients, but he ignored their requests.

### Tomanek's Activities Away from the Premises

#### Vehicle trailing

34. In December 1994, Tomanek, in his vehicle, followed Dr. West, who was leaving the clinic in his automobile. The event was non-violent and ended at a dead-end street where Tomanek displayed a pro-life sign in the window of his car when West turned around and drove

past him. Tomanek did not attempt to block West's passage out of the dead-end. West reported the incident to the police.

### Telephone Calls and Residence Visits

35. Beginning in early 1994 and continuing into the Fall of 1995, Tomanek made unwanted and harassing telephone calls to several of the clinic staff and employees.

The telephone call recipients, (Dr. William West, Dr. Opta Lea Braun and Virginia Braun, Charlotte Taft and Shelley Oram) authorized Southwestern Bell Telephone Company to perform telephone traces. The traces established that the calls were made from Tomanek's home telephone number during early morning or late evening hours.

Also, Tomanek visited the residence of Taft and Oram and left pro-life materials on the porch.

Taft and Oram pursued criminal charges against Tomanek because of his actions toward them.

36. Janie Bush's answering machine recorded numerous telephone messages from Tomanek at both her office and at her home.

37. Virginia Braun talked with Tomanek during some of these telephone calls in an effort to dissuade him from making the calls to her residence. At times during these conversations, Tomanek became argumentative and agitated. Virginia Braun taped several telephone conversations she had with Tomanek.

38. During his telephone calls to staff members, Tomanek quoted or paraphrased scripture, and told them, "Please stop killing little babies," or variations on that theme.

### Office Max Encounter

39. Barbara Bartsch-Allen encountered Tomanek at an Office Max store in October 1994. On a day that she did not go to the clinic, she was purchasing office supplies at the store, and Tomanek was there to make copies. The evidence does not establish whether Tomanek followed her into the store.

During the encounter, Tomanek stood close to her and asked whether they knew each other. When she said "No," Tomanek responded by asking "No?", then he moved on a few seconds later. He did not touch her during the encounter.

40. There is no evidence that the meeting occurred by anything other than chance.

### United States's Investigation

41. Witness Special Agent Larry Joel Fulton, who at the time of trial was a Civil Rights Coordinator, investigated Tomanek's activities at the clinic. He had been an agent with the FBI for the past thirty years. At the time of his investigation, he had been employed in the Civil Rights Unit in the Dallas area office of the Federal Bureau of Investigation for eight years.

42. Special Agent Fulton conducted an investigation of allegations of criminal violations of FACE by Tomanek. As part of his investigation, Special Agent Fulton interviewed Mary Jones, Virginia Braun, Janie Bush, Charlotte Taft, Shelley Oram, Dr. Lea Braun, Dr. William West, and Officer Evelyn Mayfield of the Dallas Police Department.

43. Special Agent Fulton's investigation began after January 30, 1995, and was completed in June 1995.

44. None of the clinic staff whom Special Agent Fulton interviewed reported to him that Tomanek had harmed them, physically threatened them, or threatened them with physical harm.

45. None of the clinic staff whom Special Agent Fulton interviewed reported to him that Tomanek physically blocked access to the clinic.

46. During his investigation, Special Agent Fulton asked clinic staff for videotapes or photographs depicting Tomanek physically blocking access to the clinic. No videotapes or photographs of Tomanek physically obstructing access to the clinic were ever furnished to Special Agent Fulton.

### Threats or Threatening Behavior

47. Tomanek was an annoyance to the clinic staff and patients and sometimes made them feel uncomfortable, but he was not a threat to them.

48. Tomanek's words to clinic staff and patrons were neither threatening nor intimidating, nor could they reasonably be considered threatening or intimidating.

49. Tomanek's words to clinic staff and patrons were neither direct nor veiled threats but were an expression of his strongly-held beliefs and opinions, and he spoke his words in the manner that a zealous religious orator might speak them to an audience or congregation.

50. Several members of the clinic staff concede that some of Tomanek's words would not be threatening or intimidating if heard in church from a preacher or priest.

51. The clinic staff never appeared to be afraid of Tomanek.

52. Although several witnesses testified that they considered Tomanek's statements and conduct toward clinic staff intimidating or threatening, the testimony of those witnesses on this

issue failed to convince the Court that such was more likely than not. Although the witnesses testified that they feared Tomanek based on his words and conduct, it is more likely that their fear was brought about by incidents of extreme violence by protesters at other abortion clinics which had recently occurred, rather than by anything actually done or said by Tomanek.

53. The vehicle trailing of Dr. West was intimidating conduct.

54. The telephone calls made by Tomanek to clinic staff were unwelcome and harassing but were not threatening or intimidating.

## Conclusions of Law

1. The United States District Court for the Northern District of Texas, Dallas Division, has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345.

2. Venue of this action is proper in this district and division.

3. Plaintiff has standing to bring this action under 18 U.S.C. § 248(c)(2)(A).

4. At all times relevant until approximately October, 1995, Tomanek resided within the jurisdiction of this Court.

5. Because Plaintiff seeks only injunctive relief under FACE, which is equitable in nature, this case was properly tried to the Court. *See Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1158 (5th Cir. 1982).

6. FACE is within Congress's Commerce Clause authority as an act which regulates activity that substantially affects interstate commerce. *U.S. v. Bird*, 124 F.3d 667, 682 (5th Cir. 1997).

7. At all relevant times, the clinic engaged in interstate commerce.

8. FACE is not facially overbroad under the First Amendment in that it regulates conduct, not speech. *U.S. v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997). Specifically, FACE prohibits only uses of force, threats of force, and physical obstruction, none of which are protected by the First Amendment. *Id.*

9. FACE is not unconstitutionally vague on its face because it provides a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *U.S. v. Bird*, 124 F.3d 667, 684.

10. FACE does not specify a burden of proof for civil actions brought under the statute. Thus, as in any civil case, Plaintiff must prove by a preponderance of the evidence that it is entitled to injunctive relief.

11. It is within the discretion of the Court whether to issue an injunction after a trial on the merits. *See North Alamo Water Supply Corp. v. City of San Juan, Texas*, 90 F.3d 910, 914, 916-17 (5th Cir. 1996) (standard of review on appeal of a district court's decision whether to enter a permanent injunction is abuse of discretion).

12. The statutory provision under which Plaintiff seeks relief allows injunctive relief against any person who:

> by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services[.]

18 U.S.C. § 248 (a)(1).

13. To obtain injunctive relief under FACE, Plaintiff must, at a minimum, prove by a preponderance of the evidence that Tomanek (1) physically blocked access to the clinic or made it unreasonably difficult or hazardous to enter or leave the clinic; or (2) placed a person providing or obtaining reproductive health services in reasonable apprehension of bodily harm to one's self or to another through threats of force.

14. There is no dispute that Tomanek never used force within the meaning of FACE, and thus the Court's inquiry is limited to whether Tomanek physically obstructed access to the clinic or employed threats of force within the meaning of FACE.

15. The First Amendment does not permit the government to punish speech merely because the speech is forceful or aggressive. What is offensive to some is passionate to others. *U.S. v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996). This articulates the crux of this case, which happens to be that rare case which "falls at the outer margins of section 248(a)(1) [of FACE] where First Amendment concerns" arise. *See U.S. v. Bird*, 124 F.3d 667, 683 (5th Cir. 1997).

### Reasons for Judgment

Plaintiff seeks a permanent injunction against Tomanek to bar him from engaging in certain types of protest activities. To warrant injunctive relief under FACE, Plaintiff must prove that Tomanek either physically blocked access to the clinic or used threats of force against those seeking or providing reproductive services. Assuming Plaintiff could meet that burden, it would then have to show that Tomanek's conduct would likely continue in the future.

Plaintiff's evidence fails to show that Tomanek ever physically blocked access to the clinic or made it unreasonably difficult or hazardous to enter or leave the clinic. Likewise, Plaintiff's evidence fails to show that Tomanek's speech or conduct ever rendered ingress to or egress from the clinic impassable, unreasonably difficult, or hazardous. The evidence further fails to show that either Tomanek's actions or his words ever interfered with any person such that he restricted that person's freedom of movement in the course of providing or obtaining reproductive health services at the clinic. As a result, Plaintiff has failed to carry its burden and therefore, is not entitled to injunctive relief against Tomanek.

Aside from showing that he occasionally stood in front of cars entering the clinic's driveways to hand out literature, the credible evidence at trial fails to show that Tomanek ever blocked access to the clinic. Although Tomanek protested at the clinic for over a year and a half, Plaintiff offered no photos, video, or witness testimony that, during this period, Tomanek ever restricted ingress or egress to the clinic for longer than the time it takes to walk across a driveway or to walk from the front of a vehicle to its side windows. Accordingly, Plaintiff fails to prove that Tomanek blocked access to the clinic or interfered with any person at the clinic within the meaning of FACE.

The Court has examined Tomanek's words in the context of the abortion controversy and the violence surrounding it, his conduct and appearance, the atmosphere at the clinic, and what is reasonable under such circumstances. Based on the Court's findings of fact, Plaintiff fails to show that Tomanek physically threatened, threatened with physical harm, or intimidated any person either seeking or providing reproductive services within the meaning of FACE. Nor does Plaintiff prove by a preponderance of the evidence that it was reasonable for any clinic staff

member or patient to feel physically threatened or intimidated by Tomanek's conduct within the meaning of FACE.

Although it is understandable that the clinic staff would feel threatened by the violence that was contemporaneously occurring at clinics elsewhere in the nation, FACE requires that Plaintiff show that <u>Tomanek</u> placed clinic workers and patrons in reasonable fear that he would inflict bodily harm upon them. No credible evidence at trial suggested, much less proved by a preponderance of the evidence, that Tomanek engaged in this type of conduct or speech.

Tomanek's statements made during telephone calls to staff members may well have been deeply offensive to the clinic staff because of their content, but the Court has found that the statements were neither direct nor veiled threats. The fact that Tomanek's words offended the clinic staff or made them feel uncomfortable does not imbue those words with sinister meaning, and they cannot reasonably be characterized as either threatening or intimidating. The calls were no doubt annoying and inappropriate, but they were not actionable under FACE. The Court notes that the clinic staff had a legal remedy against Tomanek for making harassing telephone calls which some pursued.

The bulk of Plaintiff's evidence in support of an injunction consists of those statements which Tomanek made to clinic employees at the clinic while protesting. He made statements regarding being a soldier of God, of doing God's work, and of divine judgment on those involved in providing abortion services. These statements are expressions of opinions and belief. In the context of all of his protest activities, Tomanek's words were protected speech, not threats of force or intimidation.

Tomanek used religious and philosophical statements, similar to that of a preacher or priest, to communicate his beliefs to the staff and patients at the clinic. The words expressed his view of the moral, religious, or philosophical consequences of abortion activities at the clinic. While his words may have been at times aggressive and offensive to some, they cannot be reasonably said to be either threatening or intimidating when considered in light of his overall conduct in regard to clinic staff and patients. It is only the clinic staff members' purely subjective perception of Tomanek's words that causes them to assign threatening or intimidating meaning to them. The Court finds that this subjective perception is unreasonable when considering the facts of this case. In fact, the Court concludes that Tomanek's words are protected speech under the First Amendment.

Indeed, the evidence at trial clearly supports Tomanek's argument that he did not exhibit a propensity for violence at the clinic. Testimony revealed that, when confronted twice by violence from clinic patrons, Tomanek did not react violently but merely sought escape to call the police. These incidents are indicative of his temperament and the manner in which he conducts himself when confronted with violence. The incidents occurred in view of some staff members, and so they are also indicative of the staff's knowledge of his temperament and conduct when confronted with violence at the clinic.

It was clear at trial that the clinic employees disliked Tomanek and found him a daily annoyance during the year and a half he protested at the clinic. The evidence did not show that these employees sincerely believed Tomanek to be a physical threat to them, as required under FACE. In over a year and a half of demonstrating weekly at the clinic, Tomanek never once threatened the clinic staff or patients with physical harm, nor was he ever physically violent

toward, nor did he use force against, nor did he ever physically harm, the staff or patients of the clinic. In fact, Tomanek never touched a staff member. When considered in context, Tomanek's conduct and statements cannot reasonably be interpreted as threatening or intimidating.

On one occasion Tomanek, in his vehicle, followed the car of Dr. William West. In this instance, his conduct can be reasonably interpreted as threatening or intimidating, although he did not act violently or issue threats. On another occasion, Tomanek went to the residence of clinic employees. For an extended period, he made harassing telephone calls to clinic staff members. He admitted to obstructing the entry to clinics in Illinois. These actions make for a close call. However, in light of Tomanek's conduct as a whole, and the fact that his activities have greatly diminished, the Court is unable to find and conclude that these incidents are sufficient to overcome his right to freedom of expression and, therefore, do not warrant injunctive relief.

The injunctive relief which Plaintiff seeks would, in application, impose content-based and viewpoint-based restrictions on Tomanek's conduct and speech in that it would unreasonably restrict Tomanek from sharing his personal opinions and beliefs with persons at the clinic. As such, injunctive relief would unconstitutionally burden Tomanek's free speech rights under the First Amendment. The Court will enter judgment for Tomanek on the basis that Plaintiff did not show itself entitled to injunctive relief.

It is so **ORDERED**.

Signed this 10th day of October, 1998.

Robert B. Maloney
U.S. District Judge

FINDINGS OF FACT AND
CONCLUSIONS OF LAW                                                                                  Page 19